[Civ. No. 22007. First Dist., Div. One. Aug. 18, 1965.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS, Plaintiff and Appellant, v. MARY E. SILVEIRA et al., Defendants and Respondents.

606

Harry S. Fenton, Holloway Jones, Jack M. Howard, Roger Anderson, Norval Fairman, Francis A. McEnaney, and William R. Edgar, for Plaintiff and Appellant.

Robert K. Cutler, County Counsel (Santa Barbara), Robert D. Curiel, Assistant County Counsel, Thomas M. Dankert, Bertram McLees, Jr., County Counsel (San Diego), and David B. Walker, Deputy County Counsel, as Amici Curiae on behalf of Plaintiff and Appellant.

Harold B. Lerner and Raymond H. Shone for Defendants and Respondents.

SULLIVAN, P. J.—This is an eminent domain proceeding brought to acquire for freeway purposes certain real property in Marin County owned by defendants. After a jury trial, the court below entered a judgment in condemnation awarding all defendants[1] (the Silveira family) damages in the sum of $309,080 with interest and defendant George Sil-

---

[1]Said defendants are: Mary E. Silveira, Edward J. De Borba, Administrator of the Estate of Helen Silveira De Borba, deceased, George Silveira, Anthony Silveira, Joseph Silveira, Jean O'Donnell, also known as Jean Silveira, Carlos Silveira, and Dolores Cordiero.

veira alone the additional sum of $21,700 with interest.[2] The People appeal from said judgment. We discuss *infra* in our separate consideration of the several questions raised on appeal the facts pertinent to each. At this point we set forth the following background facts.

Defendants are the owners under different tenancies of two separate properties in Marin County. The larger is a 354-acre tract owned by all defendants as tenants in common, known as the Silveira Ranch, and used as a dairy farm. It is bounded on the west by U.S. Highway 101 and on the other three sides by private lands. A railroad runs through this property, dividing it roughly into a westerly section of 260 acres and an easterly section of 94 acres. The parties are in agreement that only the 260-acre portion is material in the present case in connection with the awarding of damages. The second or smaller property here involved is a .6-acre parcel owned by defendant George Silveira alone, apart from his interest in the larger parcel, and upon which he has his residence. George's separately owned land lies entirely within the 260-acre parcel. He also owns a 40-foot wide nonexclusive easement extending from his home across the jointly owned land to U.S. Highway 101.

The larger 260-acre parcel therefore abutted the highway on the west and extended easterly to the railroad. Miller Creek traversed this property in such a way as to leave a 21-acre parcel in the northwest corner separated from the rest of the property. Access from the Silveira land to the highway had been acquired by the state at all points except four designated openings. The area north of Miller Creek had direct access to U. S. Highway 101 through a 20-foot opening; the area south of Miller Creek had direct access to the highway through two 20-foot openings and one 40-foot opening. George Silveira's easement extended to the last opening. The two northerly 20-foot openings were opposite openings in traffic islands. The property adjacent to the highway was substantially at highway grade except at the most southerly opening. At the point where it met the freeway the property was approximately four-tenths of a mile from the City of San Rafael.

---

[2] The jury returned a verdict finding (1) the fair market value of the land condemned (Parcel 5, Amended) to be $186,080; (2) the severance damages to the remaining land owned by defendants in common to be $155,000; (3) the special benefits to said remainder owned in common to be $32,000; and (4) the severance damages to the George Silveira parcel to be $21,700.

By the instant proceedings, the state is acquiring a 9.304-acre strip, identified as Parcel 5, Amended, fronting the highway and varying in depth from 30 feet at the southerly end to 850 feet at the northerly end. It is also acquiring all four rights of access to the freeway which defendants own as easements appurtenant to their lands but at the same time in the instant proceedings has provided that the remaining lands of defendants not condemned shall abut upon and have access to a certain public road.

The People do not question the sufficiency of the evidence to support the verdicts but contend that the court made certain errors which affected the ability of the jury to arrive at correct determinations of the value of the parcel condemned and the extent of severance damages. We discuss the People's contenions in the order in which they are presented.

*Defendants' valuation of the property in its "before" condition.*

Plaintiff contends that the court erred in permitting defendants to offer evidence of the value of the land in its *before* condition on a speculative theory assuming the possibility of public road connections with the freeway despite the consent requirements of Streets and Highways Code section 100.2[3] and thus in effect to predicate value and compensation on a privilege rather than a property right. It is urged that the trial court confused the private right of access to the freeway with the privilege of connecting public streets or roads to the freeway. While plaintiff concedes that the taking of the former is subject to payment by the condemnor of just compensation, it argues that such claim for compensation cannot be increased "by speculating at trial on the exercise of a privilege controlled solely by the sovereign condemnor."

At all material times U.S. Highway 101 was and is a state highway. In 1946, at least in the area here involved, it had been declared a freeway. The record shows and the parties agree that at the time the present action was commenced, all

---

[3]Section 100.2 provides in pertinent part: "No city street, county road or other public highway of any kind shall be opened into or connected with any freeway unless and until the California Highway Commission adopts a resolution consenting to the same and fixing the terms and conditions on which such connection shall be made and the said commission may give or withhold its consent or fix such terms and conditions as in its opinion will best subserve the public interest."

Hereafter unless otherwise indicated, all references are to the Streets and Highways Code.

of defendants' access to the highway had been acquired by the state except at the four openings previously mentioned. All access is being acquired by the instant proceedings. In its *before* condition therefore, defendants owned land with rights of access to the highway at four places.

Defendants offered valuation evidence in support of the theory that the highest and best use to which the subject property was adaptable in its *before* condition would be two separate subdivisions: one covering the 21-acre parcel in the northwest corner which was separated from the larger part of the property by Miller Creek and the other covering the remaining 239 acres south of Miller Creek. The first or northerly subdivision would consist of multiple and single-family residences and of property for commercial purposes other than a "highway strip." The second or southerly parcel would consist of the following: a 200-foot deep strip fronting the highway and extending southerly from Miller Creek, which would be adaptable for highway commercial purposes; a buffer strip behind it for multiple-family residences; and the remainder for single-family residences. All of defendants' witnesses agreed that their valuation of the land based on the above uses was dependent on the fact that the land had the four separate direct access openings to the highway.[4]

It was the position of plaintiff in the court below, as it is before us, that such development on the Silveira Ranch of subdivisions connected with the highway through the above openings meant the connection of public streets with the highway and of necessity required the conversion of private access openings into public streets. Since any such connection would be forbidden under section 100.2 without consent of the California Highway Commission, the possibility of obtaining such consent would be too remote and conjectural to support defendants' theory of valuation. Accordingly, plaintiff's valuation evidence was responsive to the theory that the highest and best use of the land did not include a highway commercial strip but a planned community subdivision connected to a public road which would have been probably located along the northern boundary of the ranch as projected by the Marin County Master Plan.

---

[4]As stated, *supra,* the 21-acre parcel north of Miller Creek had access through one 20-foot opening and the remaining acreage south of Miller Creek had access through one 40-foot opening and two 20-foot openings in that order going south.

Plaintiff introduced evidence of plans and resolutions of the Marin County Planning Commission and Board of Supervisors and of the State Highway Commission which showed that the only authorized *public* roadway which would connect the Silveira lands to the freeway would be north of the Silveira property near its boundary with the St. Vincent's property. In addition, plaintiff introduced in evidence a Marin County ordinance establishing minimum widths for streets in order to show that a subdivision connected to a highway at openings only 20 and 40 feet wide would not meet legal requirements and would not be feasible. There was other evidence directed to the impracticality of building a subdivision as envisioned with defendants' valuation theory because of the width of the access openings, the safety factors involved, local county regulations and the freeway plans of the Division of Highways. Defendants, on the other hand, offered evidence that such subdivisions with access for the land at four points would have been approved by the board of supervisors which apparently had the final decision in the matter, the ordinance as to minimum street widths to the contrary notwithstanding. There was also evidence that the plans placing a connecting public roadway north of the Silveira lands were intended only as a guide.

During the course of defendants' case, plaintiff moved to strike the valuation testimony of defendants' witness Clark in reference to the value of the land in its *before* condition and to the amount of severance damages on the ground that such opinion was speculative and conjectural because it was based on the assumption that the public streets of the subdivision projected by Clark could be connected with the freeway. The court denied the motion.[5]

In its instructions on severance damages, the court instructed the jury in words or substance as follows: That they should not consider anything as tending to depreciate market value which was "uncertain, remote, speculative or imaginary or merely possible"; that at the time of the commencement of the proceedings defendants had a right of

[5]The transcript discloses that this motion was made after the conclusion of the testimony of Clark and two subsequent defense witnesses and apparently for the purpose of "making a record." In denying the motion the trial judge stated: "I believe that a similar question arose very early in the trial and I said that it just simply appeared to me that the Division of Highways couldn't grant—that is, leave an access opening when they are buying up the right of access, leaving an exception without condemning, then under some other authority come back and take that same access by refusing to allow a connection."

access, i.e., a right of ingress and egress, at four specified openings, which was a property right; that defendants' rights of access "were without legal restrictions as to usage" and "could have been used in connection with any lawful use of lands whether that use be commercial, residential, or the use to which the property has been devoted";[6] that with regard to the *before* condition the connection of a public street or road with U.S. Highway 101 required the consent of the California Highway Commission.[7] In its findings of fact, the trial court found that at the commencement of the proceedings, defendants "owned and possessed unrestricted easements of access to the State highway . . . through four designated openings . . . all of said accesses are being acquired."

In essence the issue presented is this: Was the adaptability of defendants' lands in their *before* condition for subdivision purposes in the manner assumed by defendants' valuation witnesses speculative because it depended upon the obtaining of the consent of the California Highway Commission to any connection of a public street or road with the freeway?

■ It is well settled that when the land involved is reasonably adaptable to subdivision purposes, that fact may be taken into consideration in fixing its market value. (*City of Los Angeles* v. *Hughes* (1927) 202 Cal. 731, 733 [262 P. 737]; *People* v. *Olsen* (1930) 109 Cal.App. 523, 533 [293 P. 645]; *Santa Clara County Flood Control & Water Conservation Dist.* v. *Freitas* (1960) 177 Cal.App.2d 264, 267 [2 Cal. Rptr. 129]; see generally 17 Cal.Jur.2d 647; 4 Nichols on Eminent Domain (3d ed.) § 12.3142.) ■ However, the uses to which the land may be thus adapted must be reasonably probable and not entirely remote or speculative. (*People* v. *McReynolds* (1939) 31 Cal.App.2d 219, 224 [87 P.2d 734]; 4 Nichols, *op. cit. supra.*) Nichols also states: "Where, however, a particular use of property is prohibited or restricted by law, but there is a reasonable probability that the prohibition or restriction will be modified or removed in the near future, the effect of such probability upon the value of the property may be taken into consideration." (4 Nichols, *op. cit.*, § 12.3143; see *Long Beach City H.S. Dist.* v. *Stewart* (1947) 30 Cal.2d 763, 768-769 [185 P.2d 585, 173 A.L.R. 249]; *People* v. *Dunn* (1956) 46 Cal.2d 639, 642 [297 P.2d

---

[6]See fn. 12, *infra.*

[7]See fn. 13, *infra.*

964]; *Pacific Gas & Elec. Co.* v. *Hufford* (1957) 49 Cal.2d 545, 561-562, 564 [319 P.2d 1033]; *People* ex rel. *Dept. of Public Works* v. *Donovan* (1962) 57 Cal.2d 346, 352, 353-354 [19 Cal.Rptr. 473, 369 P.2d 1].)

Plaintiff does not contend that the availability of the land in its *before* condition for subdivision purposes as outlined by defendants' witnesses was *in itself* speculative or remote. Nor does plaintiff claim that defendants' theory of development was speculative because of restrictions on zoning or because the construction of roads in the subdivision extending to and through the existing four openings on the highway was impossible or improbable from an engineering or safety point of view, or even illegal. As we have pointed out, there was evidence that the subdivisions as outlined by defendants with access for the property at the four openings would have been approved by the board of supervisors and that despite the county ordinance establishing minimum widths for streets, the final decision in such matters rested with the board. Plaintiff's sole claim is that the entire development was speculative because the connection of its streets or roads with the freeway required the state's consent which could have been given or withheld at will.

However, we are not dealing with a situation where, there being *no* existing rights of access, it is sought to have public streets or roads ''opened into or connected with'' a freeway. In respect to its *before* condition of the land, defendants' access rights, although limited in number and fixed in location, were, as we think the court properly determined, ''unrestricted easements of access'' which were ''without legal restrictions as to usage.'' We find no support in the record for plaintiff's assertion that these rights of access were ''limited or restricted.'' The parties agree that prior to the commencement of the instant proceedings, the state had acquired all rights of access of defendants except at the three 20-foot openings and the one 40-foot opening. However, the instrument effectuating the acquisition of the 20-foot openings is not evidence.[8] As to the fourth opening, it will be recalled

[8]Upon defendants' objection, a certified copy of the deed from Mary E. Silveira, administratrix of the Estate of A. F. Silveira, deceased, to the State of California, dated April 6, 1951 (plaintiff's exhibit 26 for identification), was excluded from evidence. Plaintiff makes no contention herein that it should have been received. Even if the point were raised, it is to be noted that the above deed contains the following language: ''This conveyance is made for the purposes of a freeway and the grantor hereby releases and relinquishes to the grantee any and all abutter's rights of access, appurtenant to grantor's remaining property,

that the parties entered into a stipulation, incorporated in the pretrial conference order, that "the easement of GEORGE SILVEIRA, is a nonexclusive easement right to the use of which is not only in GEORGE SILVEIRA, but all co-tenants over and across said easement and also, through the 40-foot opening into Highway 101."[9] The record therefore discloses that in respect to the *before* condition of the land defendants owned four easements of access of specified widths and at definite locations along the freeway but discloses no limitation or restriction of such easements in any other respect. It is therefore reasonable to conclude that the nature and extent of all four easements was the same as they had been prior to the state's acquisition of all other abutter's rights of access.

■ This right of access which the abutting owner has to the public highway upon which his land fronts is an easement therein for the purposes of ingress and egress to and from his land which attaches to such land, in which he has a right of property as fully as he has in the land itself and which cannot be destroyed or substantially impaired for the benefit of the public without adequate compensation. (*Eachus* v. *Los Angeles Consolidated Elec. Ry. Co.* (1894) 103 Cal. 614, 617-618 [37 P. 750, 42 Am.St.Rep. 149]; *Cushing-Wetmore Co.* v. *Gray* (1907) 152 Cal. 118, 122-123 [92 P. 70, 125 Am. St.Rep. 47]; *Lane* v. *San Diego Elec. Ry. Co.* (1929) 208 Cal. 29, 33 [280 P. 109]; *McCandless* v. *City of Los Angeles* (1931) 214 Cal. 67, 70-71 [4 P.2d 139]; *Rose* v. *State of California* (1942) 19 Cal.2d 713, 727-728 [123 P.2d 505]; *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 349-350 [144 P.2d 818]; *People* v. *Ricciardi* (1943) 23 Cal.2d 390, 397 [144 P.2d 799].)

■ Since, in respect to the *before* condition of the property, the state had not acquired all of defendants' abutters'

---

in and to said freeway. Also any and all abutter's rights of access over and across the following lines: . . . EXCEPTING AND RESERVING, however, unto grantor, her successors or assigns, the right of access, in and to said freeway, over and across'' the three designated 20-foot openings. However, it contains no language restricting the nature or purpose of the easements reserved other than that they are rights of access. The fact that such rights of access were not created by grant but retained by reservation confirms the conclusion that no restrictions were imposed.

[9]This stipulation in effect gave recognition to the easement created by a prior deed between Mary Silveira, as administratrix, and George Silveira dated January 29, 1951. By that instrument the grantor conveyed to George the .6 acres heretofore mentioned ''together with an easement for roadway and utility purposes over and across a strip of land 40 feet wide lying 20 feet on each side of the above described roadway center line leading to the State Highway.''

rights of access and since defendants had unrestricted easements of access at the four openings, the situation not involving the establishment of *new* openings, we think that defendants could reasonably expect that any necessary consent of the California Highway Commission to the connection of a public road or street with the freeway at the particular opening would in all probability be obtainable and that considered in its totality, defendants' theory of valuation as to the uses to which the land might have been developed was reasonably probable and not entirely remote or speculative.

There is another aspect to this problem which must not be lost sight of. The present issue, as we have repeatedly emphasized, involves the land *only* in its *before* condition. We must therefore measure the factor of reasonable probability by a view in retrospect and reach a just resolution of an issue dealing with what "could have been." ▪ Under these circumstances we do not believe that the condemning authorities, having left to the abutting owners four unrestricted rights of access, can in a subsequent proceeding to acquire all such rights, claim that they are restricted rights because it is within the absolute power of the condemnor to withhold consent to their use as connections for a public road or street. This seems to have been the view of the learned trial judge.[10] To countenance this argument would be in effect to permit the condemnor to accomplish indirectly a substantial impairment of the abutter's vested property rights without compensation.

Plaintiff relies on several cases,[11] holding to the proposition, with which there can be no quarrel, that damages in eminent domain proceedings must be based on the destruction or impairment of existing rights in respect to the particular property and not on mere possibilities. The cited cases are not here applicable.

The court's instructions to which plaintiff objects[12] were

---

[10]See fn. 5, *ante*.

[11]Plaintiff cites: *United States* ex rel. *Tennessee Valley Authority* v. *Powelson* (1943) 319 U.S. 266, 276-277 [63 S.Ct. 1047, 87 L.Ed. 1390]; *City of Pasadena* v. *Union Trust Co.* (1934) 138 Cal.App. 21, 26-27 [31 P.2d 463]; *Central Pac. R.R. Co.* v. *Pearson* (1868) 35 Cal. 247, 262-263; *City of Oakland* v. *Parker* (1924) 70 Cal.App. 295, 298-299 [233 P. 68]; *City of Los Angeles* v. *Geiger* (1949) 94 Cal.App.2d 180, 191, 195-196 [210 P.2d 717].)

[12]These instructions are: "The right of access, possessed by the defendants, through four openings depicted in plaintiff's Exhibit 1 and Defendants' Exhibit 3, were without legal restrictions as to usage. That is to say, the access through the four openings could have been used in

correct statements of the law, did not contradict the instructions defining the powers of the Highway Commission[13] and did not in any way constitute an endorsement of or argument for defendants' theory of case.

The court's instructions dealing with the width requirements of the four access openings to U.S. Highway 101[14] are also correct statements of the law and were not contrary to the Marin County ordinance specifying minimum road widths. The instructions told the jury in effect that the county road width requirements did not apply to the four access openings. Plaintiff makes much of the apparent impossibility of putting streets of legal width through the existing

---

connection with any lawful use of lands whether that use be commercial, residential, or the use to which the property has been devoted. . . .

"The lands of the defendants are situated in an unincorporated area of the County of Marin, and therefore the regulation and control of the use to which the property may be put is vested in the Board of Supervisors of the County of Marin. Neither the State nor the Department of Public Works may determine or control the use of such private property."

[13]These instructions are: "In the use of the right of access to a State highway, property owners may be required to apply to the Department of Public Works of the State of California for an encroachment permit, which is a permit to construct improvements upon the public highway. And although in the granting of an encroachment permit, the Department of Public Works of the State of California may impose conditions with respect to the design and construction of the improvements, it may not arbitrarily or capriciously deny an encroachment permit.

"With regard to the before condition, and the possibility of connecting subdivision streets to the highway through the existing openings, you are instructed that no city street or county road or other public highway could have been connected with Highway 101 through said openings unless and until the California Highway Commission adopted a resolution consenting to such connection and fixing the terms and conditions on which the connection could have been made. The Highway Commission could give or withhold its consent or it could fix such terms and conditions as in its opinion could best subserve the public interest. . . .

"In determining the value of the property in the before condition, it is proper for you to consider whether or not there was a reasonable probability that a public road could have been connected to U.S. Highway 101 at the northwesterly corner of the Silveira property across from Miller Creek Road and whether defendants' property could have been connected thereto."

[14] These instructions are: "In connection with the four accesses to Highway 101, possessed by the defendants, witnesses have testified to width requirements of roadways. Although there are statutes governing the minimum widths of county and state highways, there is no law setting minimum standards for the width or use of private access openings to a State highway.

"The legal minimum width of all county highways is forty feet, except that this minimum width may be diminished to less than forty feet by the Board of Supervisors; and the legal minimum width of a State highway is forty feet."

openings. It thus assumes that this type of connection had to be effected. The instruction makes clear that the width of the opening did not have to fit the width of the street.

*Instructions on separate valuation of parcel condemned.*

Plaintiff contends that the court erred in giving the instructions set forth in the footnote[15] directing the jury to determine whether the part of defendants' tract of land taken (the 9.304-acre strip) had a greater value considered as a *separate* and *distinct* piece of property *disconnected* from the remainder of the tract or when considered as a fraction or part of the entire tract, and to take the higher market value. Relying on *City of Los Angeles* v. *Allen* (1934) 1 Cal.2d 572 [36 P.2d 611], plaintiff argues that the part taken must be valued as a part of the entire tract because otherwise a separate valuation would result in the inclusion of severance damages in the award for the part taken. At the same time plaintiff concedes that in valuing the "take" as a part of the whole, the average square foot or average acre value need not be ascribed to the part taken, but that "the value of the entire parcel may be apportioned disproportionately over the entire area" in accordance with the rules developed in *People* v. *Loop* (1954) 127 Cal.App.2d 786 [274 P.2d 885].

The law is settled that in a condemnation proceeding the owner must be awarded not only the value of the property sought to be condemned but in addition thereto if such property "constitutes only a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned, by reason of its severance from the portion sought to be condemned, and the construction of the improvement in

[15]These instructions were as follows: "When the condemnor does not take the whole but takes only a part of the tract of land owned by the landowner, then you must determine the market value of the part taken according to the following method:

"You must determine whether it has a greater value considered as a separate and distinct piece of property disconnected from the remainder of the tract, or whether the part taken has a greater value considered as a fraction or part of the entire tract. You must then select from those two valuation methods whichever one of the two produces the higher and greater market value, and make your awards accordingly. The landowner is entitled to the highest value.

"In this case before you a strip of land of varying widths is being taken by the State, and the strip is a part of a larger parcel of land. In determining the market value of the strip you need not consider it as though it were being sold as a distinct and separate piece of property in the market, unless you find that it would have a higher or greater value if sold that way, having in mind that the owner is entitled to the highest value in the market."

the manner proposed by the plaintiff." (Code Civ. Proc., § 1248, subd. 2; *People* v. *Thompson* (1954) 43 Cal.2d 13, 18 [271 P.2d 507]; *People* v. *Loop, supra,* 127 Cal.App.2d 786, 791; *People* v. *Hayward Bldg. Materials Co.* (1963) 213 Cal. App.2d 457, 464 [28 Cal.Rptr. 782].) "Severance damages are determined by ascertaining the market value of the *property not taken* as it *was* on the date fixed for determining such damages, and by deducting therefrom the market value of *such remaining property after the severance* of the part taken and the construction of the improvement in the manner proposed by the plaintiff." (Italics added.) (*People* v. *Loop, supra,* 127 Cal.App.2d 786, 799; see also *People* v. *Thompson, supra,* 43 Cal.2d 13, 25; *People* v. *Ricciardi, supra,* 23 Cal.2d 390, 401; *Sacramento Southern R. R. Co.* v. *Heilbron* (1909) 156 Cal. 408, 414-415 [104 P. 979]; *County of Los Angeles* v. *Pan American Dev. Corp.* (1956) 146 Cal.App.2d 15, 19 [303 P.2d 61]; *People* v. *Hayward Bldg. Materials Co., supra,* 213 Cal.App.2d 457, 464.)

It is also settled, and plaintiff concedes, that "in determining the market value of the parcel condemned it is not proper to attribute a per-square-foot value to defendants' entire property and then apply the value to the parcel condemned unless each square foot of defendants' land has the same value and that, if the parcel condemned is different in quality from the rest of the land, it should be assigned a different value." (*Los Angeles County Flood etc. Dist.* v. *McNulty* (1963) 59 Cal.2d 333, 336 [29 Cal.Rptr. 13, 379 P.2d 493]; *People* ex rel. *Dept. of Public Works* v. *Neider* (1961) 195 Cal.App.2d 582, 590 [16 Cal.Rptr. 58]; *Hayward Union High Sch. Dist.* v. *Lemos* (1960) 187 Cal.App.2d 348, 353 [9 Cal.Rptr. 750]; *People* v. *Loop, supra,* 127 Cal.App.2d 786, 796-800; 4 Nichols, *op. cit.,* § 14.231, p. 545.) .

In *City of Los Angeles* v. *Allen, supra,* 1 Cal.2d 572, on which plaintiff relies, the property sought to be condemned was a narrow strip fronting a city boulevard, which strip was a part of a substantial acreage of extensive depth. There was no evidence of the value which the part taken would have if separately owned and unconnected with the remainder and the parties seemed to have assumed that a piece of land of such slight depth could not have been put to a very valuable use. It was clear, however, that the acreage near the boulevard was more valuable than that remote from it. Accordingly, the referees averaged out the higher values ($1.64) per

square foot of the front area with the lower values (25 cents) of the rear area and arrived at an average value (32 cents) per square foot for the entire tract. They then computed the value of the strip taken by multiplying the number of square feet contained therein by 32 cents. Since the condemnee in that case claimed no severance damages, the portion of the property not taken under the above method of computation had the same value after the severance. The court therefore properly rejected the condemnee's claim on appeal that the part taken should have been valued at the higher per square foot rule of $1.64, since this would leave the condemnee in possession of more than it had originally and its receipt of the additional sum ''could be justified only if damage resulting to the remaining portion by the severance reduced its value to that extent.'' (*City of Los Angeles* v. *Allen, supra,* 1 Cal.2d 572, 577.) The result in *Allen* was just and proper under the particular facts of that case. But *Allen* does not stand for the proposition, as plaintiff here asserts, that where the property sought to be condemned is a part of a larger parcel, it must in all instances be valued as a part of the whole, despite the fact that it may have a greater value as a separate and distinct piece of property.

However correct the decision in *Allen* may be on its own particular facts, it furnishes no support for plaintiff's groundless assertion that under the particular facts of the instant case, the separate valuation of the parcel condemned was an indirect award of severance damages and compelled plaintiff ''to pay duplicated, excessive unascertained severance damages.'' Plaintiff's argument seems to be this: that to value the parcel taken separately and ''then to consider the same portion *as a part of the larger parcel* for awarding severance damages'' (italics added) must necessarily result in duplicative and excessive damages.

In answer to this claim, it is worthy of note that immediately following the instructions which plaintiff now attacks (see fn. 15, *ante*) the court gave the following instructions on severance damages, which plaintiff chooses to ignore: ''After you have determined the market value of the property sought to be acquired, you must then ascertain the amount of damage, if any, to the remaining property. This damage, if any, is determined by ascertaining the market value of the *remaining* property as it was on November 14th, 1960,[16] and

---

[16]This date is the date of entry of the ''Order Fixing Security To Permit Plaintiff To Take Immediate Possession. . . .''

by deducting therefrom the market value of said *remaining* property after the severance of the part acquired and the construction of the highway in the manner proposed by plaintiff. . . . In computing such severance damage, if any, *you are to exclude the portion to be acquired,* and are to consider only the before and after value of the remaining property. You will *separately* assess in your verdict the market value of the portion sought to be acquired.'' (Italics added.)

When the last mentioned instructions are read together with the instructions here under attack it is manifest that, contrary to plaintiff's claim, the jury were *not* told to consider the part taken as part of the larger parcel for the purpose of awarding severance damages but were told to exclude such part from their consideration and to consider *only* the before and after value of the remainder. There is thus no support for plaintiff's thesis that, under the instructions complained of, a separate valuation of the part taken included an indirect award for severance damages.[17]

Nor is there support for plaintiff's broader proposition that in all instances of ''partial-taking,'' the *exclusive* method for valuing the part taken must be as a part of the whole. The requirement that the part taken must be valued as a part of the whole and not as if it stood alone has been imposed because ordinarily this relationship gives the part— particularly where it is a narrow strip—a greater value. (See 4 Nichols, *op. cit.,* § 14.231, pp. 544-545; 1 Orgel on Valuation under Eminent Domain (2d ed.) § 52, p. 237.) This rule has been applied in order to protect the condemnee and assure him a just award because otherwise the part taken would normally be useless and valueless if considered by itself. (*City of Downey* v. *Royal* (1963) 215 Cal.App.2d 523, 527-528 [30 Cal.Rptr. 159]; *Napa Union H. S. Dist.* v. *Lewis* (1958) 158 Cal.App.2d 69, 72-73 [322 P.2d 39]; see *Yolo Water & Power Co.* v. *Hudson* (1920) 182 Cal. 48, 52 [186 P. 772].) Since the rule applied in the foregoing cases is obviously for the condemnee's benefit, the instruction presently

[17]Plaintiff's reliance on *Commonwealth* v. *Blanton* (Ky. 1961) 352 S.W.2d 545; *Frank* v. *State Department of Roads* (1964) 176 Neb. 759 [127 N.W.2d 300]; *Aaronson* v. *United States* (C.A.D.C. 1935) 79 F.2d 139 [65 App.D.C. 14] and *American States Security Co.* v. *Milwaukee N. Ry. Co.* (1909) 139 Wis. 199 [120 N.W. 844] is misplaced. The foregoing cases are inapplicable to the problem here presented and require no separate discussion.

under examination violates neither its letter nor spirit. By directing the jury to select from the two valuation methods therein referred to the one producing the higher value, the instruction represents a correct statement of the measure of damages in terms of market value, "that is to say, the *highest price* estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable." (Italics added.) (*Sacramento Southern R. R. Co.* v. *Heilbron, supra,* 156 Cal. 408, 409; *People* v. *Ricciardi, supra,* 23 Cal.2d 390, 401.)

Finally, plaintiff claims that the instructions on separate valuation were improper under the holding in *People* v. *Loop, supra,* 127 Cal.App.2d 786, 799-800 and *People* ex rel. *Dept. of Public Works* v. *Neider, supra,* 195 Cal.App.2d 582, 590, since they directed the jury to embrace defendants' theory of valuation and disregard plaintiff's theory. However, unlike the instructions disapproved in those cases, the instant instructions did not thus invade the fact finding province of the jury who still had to decide whether the highest and best uses of the parcel taken were those outlined by plaintiff's valuation witnesses or those outlined by defendants' witnesses.

*Proposed freeway connection for property in its "after" condition.*

It is contended that the court improperly foreclosed plaintiff from showing that in the *after* condition the remainder of the Silveira Ranch, although no longer having the four access openings, would have a public road connection, for ingress purposes only, directly from the freeway to the section of the property south of Miller Creek. As we have stated, all access to the freeway was being acquired by the present proceedings. Nevertheless, on cross-examination of defendants' witness Clark, plaintiff's counsel asked the witness if he had considered the reasonable probability that "there would be an opening to 101 in the after condition." The court refused to permit introduction of such evidence. Shortly thereafter, outside the jury's presence, plaintiff offered in evidence a certified copy of proceedings of the California Highway Commission approving such a connection on certain conditions and a map prepared by *defendants'* engineer which had been used in the above proceedings to

obtain such approval. The court sustained the objection to the introduction of the above evidence, apparently because it seemed to controvert the position of the state in its pleadings and the amended pretrial conference order that all "access" to the freeway was being acquired.

The court's rulings were correct. Under the pleadings and the terms of the pretrial conference order all access to defendants' property was being acquired. Plaintiff's maps depicting the proposed construction showed no connection from the freeway to the property at the place claimed nor did plaintiff's engineer Karst testify to any. All of defendants' value witnesses, consistently with the issues as thus framed, based their opinions as to severance damages on the premise that in its *after* condition the property would have no direct access to the freeway. Finally, the approval by the Highway Commission of the freeway connection in question was "conditioned upon the firming up of a County Road to which the off-ramp would connect, the firming up being subject to the approval of the Commission." Plaintiff offered no evidence that the Marin County Board of Supervisors had carried out their intention by causing the inclusion of such a county road on a master plan.

It is settled that, in accordance with the wording of subdivisions 2 and 3 of section 1248 of the Code of Civil Procedure "in awarding damages in a condemnation case the jury must act upon the assumption that the improvement will be carried out as proposed." (*People* ex rel. *Dept. of Public Works* v. *Edgar* (1963) 219 Cal.App.2d 381, 386 [32 Cal.Rptr. 892]; see also *People* v. *Ayon* (1960) 54 Cal.2d 217, 229 [5 Cal.Rptr. 151, 352 P.2d 519]; *People* ex rel. *Dept. of Public Works* v. *Schultz Co.* (1954) 123 Cal.App.2d 925, 932-933 [268 P.2d 117]; *People* v. *Adamson* (1953) 118 Cal. App.2d 714, 721-722 [258 P.2d 1020].)[18] ▮ A condem-

---

[18]Code Civ. Proc., § 1248 provides in relevant part: "The court, jury, or referee must hear such legal testimony as may be offered by any of the parties to the proceeding, and thereupon must ascertain and assess: . . .

"2. If the property sought to be condemned constitutes only a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned, by reason of its severance from the portion sought to be condemned, and *the construction of the improvement in the manner proposed by the plaintiff*;

"3. Separately, how much the portion not sought to be condemned, and each estate or interest therein, will be benefited, if at all, *by the construction of the improvement proposed by the plaintiffs*; . . ." (Italics added.)

nation award must once and for all fix the damages, present and prospective, that will accrue reasonably from the construction of the improvement and in this connection must consider the most injurious use of the property reasonably possible. (*People* ex rel. *Dept. of Public Works* v. *Schultz Co., supra,* at p. 935.) Although in the last cited cases the abovementioned rule was applied against the condemnee, we apprehend no reason why it should not be equally operative against the condemnor.

### Comparable sales of smaller properties.

Plaintiff next contends that the court erred in receiving in evidence, over plaintiff's objections in most instances, testimony in respect to numerous small sales of one acre or less as comparable sales. In substance, plaintiff's objections were to the effect that the properties sold were not comparable in size to defendants' property here involved, having in mind that the latter embraced approximately 260 acres. Although the subject properties of the comparable sales were not subdivided, plaintiff's position is that some of them were so small that as a result plaintiff was forced to pay subdivision prices for raw land.

Defendants' witnesses selected the sales to which they testified because the parcels sold were comparable to the subject property in that each one was adaptable to the same uses to which the subject property was adaptable: some were adaptable to highway commercial, others were adaptable to single and multiple-family residential development.

Section 1845.5 of the Code of Civil Procedure provides in part that "In an eminent domain proceeding a witness, otherwise qualified, . . . may testify on direct examination as to his knowledge of the amount paid for comparable property or property interests." In *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 676-679 [312 P.2d 680], the Supreme Court, overruling a line of decisions theretofore declaring a contrary rule, held that in a condemnation proceeding evidence of prices paid for similar property in the vicinity, including prices paid by the condemning authority, was admissible on direct examination as well as on cross-examination of a witness who was testifying as to the value of the condemned property. The court quoted from McCormick on Evidence (1954) section 166, page 348, an excerpt which expresses the author's approval of a rule admitting evidence of prices paid for other parcels of land as relevant to the value

of the land in issue: " '[T]he view of the majority of courts which admits such evidence, within safeguarding limits, seems preferable. These safeguards are the following: The sales of the other tracts must have been sufficiently near in time, and the other land must be located sufficiently near the land to be valued, and must be sufficiently alike in respect to character, situation, usability, and improvements, to make it clear that the two tracts are comparable in value and that the price realized for the other land may fairly be considered as shedding light on the value of the land in question. Manifestly, the trial judge in applying so vague a standard must be granted a wide discretion.' " (48 Cal.2d 672 at p. 678; see also *People* ex rel. *Dept. of Public Works* v. *Kawamoto* (1964) 230 Cal.App.2d 18, 21 [40 Cal.Rptr 685] (upholding admission); *Los Angeles etc. School Dist.* v. *Swensen* (1964) 226 Cal.App.2d 574, 583 [38 Cal.Rptr. 214] (upholding exclusion); *People* ex rel. *State Park Com.* v. *Johnson* (1962) 203 Cal.App.2d 712, 718-719 [22 Cal.Rptr. 149], appeal dismissed 372 U.S. 703 [83 S.Ct. 1017, 10 L.Ed.2d 124] (reversing on grounds of lack of similarity); *County of Los Angeles* v. *Bean* (1959) 176 Cal.App.2d 521, 528 [1 Cal.Rptr. 464] (upholding finding of no comparability); *Covina Union High School Dist.* v. *Jobe* (1959) 174 Cal.App.2d 340, 349-350 [345 P.2d 78] (upholding admission); *City of San Diego* v. *Boggeln* (1958) 164 Cal.App.2d 1, 8 [330 P.2d 74] (upholding exclusion).)

It seems to be plaintiff's position that where the properties involved in other sales are not of comparable size, such sales are as a matter of law not sufficiently comparable so that, in the language of McCormick quoted in *Faus* upon which plaintiff relies, " 'the price realized for the other land may fairly be considered as shedding light on the value of the land in question.' " (*County of Los Angeles* v. *Faus, supra,* 48 Cal.2d 672, 678.) An identical contention was rejected by the court in *Covina Union High School Dist.* v. *Jobe, supra,* 174 Cal.App.2d 340, where the property in other sales, all of recent date, ranged in size from 1 per cent to 6½ per cent of the size of the property condemned and where there was no sale of property of the size of that condemned. The court said: "The judge at the time when the question came up for discussion in the trial said in effect that size alone was not the determining factor. The smaller sales could have shown the adaptability of the defendant's property for subdivision, a trend of market value, a trend of the develop-

ment in the area and various other things which would be of advantage to a prospective buyer. . . . We should not assume that the trial court abused its discretion. In fact the rule is exactly the opposite. [Citations.] There can be no absolute formula or definition of what constitutes similar or like property. Certainly, similar does not mean identical. It appears to us that the determination must vary with each particular case. The *Faus* case, *supra,* mentioned the items of time, location, character, situation, usability and improvement. Nothing is said about size.'' (Pp. 349-350.)

We have reviewed the comparable sales objected to in the instant case and are satisfied that the trial court did not abuse its discretion in admitting them in evidence.

*Evidence pertaining to an economic approach to value.*

Through its expert witnesses, plaintiff presented evidence in support of the so-called economic approach to value. As disclosed by the evidence, this method of appraisal used by experts in the field was directed to arriving at a fair market value of ''raw'' unsubdivided land from estimated values of ''retail'' developed lots based on comparable sales of parcels sold for similar purposes after deducting from the gross value of the ''ultimate development,'' the expenses of development, anticipated profits and an anticipated loss for the ''absorption factor.'' The end result of the method was a figure representing value of the raw land on the date fixed for determining compensation.

Plaintiff's valuation witness Morphy, after explaining the three general approaches in the appraisal process, that is to say the comparable sales approach, the income approach, and the economic approach, gave his opinion as to value based on comparable sales. This witness opined that the fair market value of the entire 260 acres was $2,275,000 and that of the 9.304-acre strip taken was $81,500. Morphy then testified to an ''economic analysis'' approach employed by him which followed the general pattern of the so-called economic approach referred to above. He was then asked if, from his economic analysis, he had obtained ''an indicated value of the raw land'' and over objection of defendants' counsel, testified that he had arrived at a value of $2,278,000 for the 260 acres or $8,760 per acre.

Plaintiff's witness Cohn testified that in his opinion, after considering comparable sales, the value of the 260 acres was $2,105,000 and the value of the 9.304 acres taken was $86,059.

He was then asked if he worked out "an economic analysis" and over defendants' objection, testified that he used a similar economic approach, arriving at a value of $2,399,450 for the 260 acres or $8,100 an acre.

Plaintiff's witness Simmons, having first testified to a "comparable sales approach," thereafter, over defendants' objection, testified to an economic analysis generally similar to that of Morphy and Cohn. During the course of this testimony, the court admitted in evidence over defendants' objection a chart summarizing Simmons' "economic analysis." It is noteworthy that as a summary question, the witness was reminded that "You have testified to the economic approach to give an indicated value and used your comparable sales approach to give an indicated value" whereupon defendants' counsel objected, stating to the court that "The economic approach was admitted in evidence only for the feasibility of the use of the property as an integrated unit development" and that "I objected to the admission of it except to show the adaptability of the property for such a use. They cannot use it as evidence that it go into market value. The law says that." Upon pursuance of this line of questioning, defendants' objection was renewed, at which point plaintiff's counsel stated: "It is merely a check on the ultimate opinion of fair market value which we are coming to." The court thereupon declared: "From that standpoint I will overrule the objection, if you are presenting his testimony only for the purpose of checking to indicate the feasibility of use of the property." Eventually the witness gave his opinion that the value of the 260 acres was $2,217,250[19] and the value of the parcel taken was $117,600.

On cross-examination, Simmons testified that he did not use his economic analysis in determining the fair market value of the property in its *before* condition but that he used it for two purposes: "One, in order to arrive at an indication of the highest and best use of the property and the other as a check on the value indicated by the market data and to show the amount a prudent investor could reasonably pay under the conditions." The court thereupon granted defendants' motion to strike all value testimony predicated on plaintiff's exhibit 22 and to withdraw said exhibit, stating "The Exhibit will be withdrawn and removed from evidence and the

---

[19]The chart in plaintiff's opening brief gives the sum of $2,127,250, apparently an inadvertent transposition of numerals.

jury will disregard any testimony of the witness as to any money value of the property based on considerations derived from economic analysis. His other testimony is not to be disturbed but with reference to the so-called economic analysis the Exhibit will be withdrawn and the jury will disregard it and the testimony is stricken.'' Upon inquiry by plaintiff's counsel, the court explained: ''The exhibit is being withdrawn. Any testimony in connection with placing a monetary value is being stricken. Testimony in connection with the exhibit that indicates his belief on the availability of the property for certain purposes or non-availability is to remain in the record.'' Defendants' counsel at that point made a motion to strike the witness Cohn's testimony ''predicated on the capitalization method in arriving at his value'' which the court took under advisement.

Plaintiff's counsel, in retaliation against defendants' motion, later made a motion to strike the testimony of defendants' witnesses Brodsgar, Jordan, Heifetz and Clark on the ground that their valuations were based on the value of the land for specific uses and on anticipated profits from such uses. Finally the court, adverting to defendants' motion to strike Cohn's testimony, advised the jury that the same ruling made by it in respect to Simmons ''is now hereby made also with reference to the testimony of any other witness in the case who may have testified to any such economic study or residual raw land value approach *whether called by the plaintiff or the defendant.*'' (Italics added.)[20]

Plaintiff contends that the court committed prejudicial error in striking plaintiff's exhibit 22, in refusing to allow Simmons to testify to his ''economic study,'' and in belatedly striking Cohn's ''economic testimony.'' It is argued that such evidence was admissible not only on the adaptability of the property to the commercial and residential developments testified to by witnesses for both parties but also as a check on fair market value. The court's ruling

[20]The court further explained: ''That portion of the testimony of any witness in the case relative to the subject of an economic study or residual raw land value approach has been stricken from the record in so far as it purports to support a finding of a dollar value of the land or a finding as to what a purchaser could afford to pay for the property, and it will be disregarded by the jury as will be any finding of tentative or final money valuation placed upon the subject property as the result of such study. But the testimony with reference to the economic approach may be considered by the jury for other purposes, such as to aid it in determining what is the highest and best use of the land and the feasibility of its use for a given purpose.''

and instruction were criticized because they told the jury in effect to disregard any economic study in reaching its verdict.

It is obvious that plaintiff misconceives the effect of the court's ruling. The court told the jury that they *could* consider the "economic approach" evidence for purposes *other* than arriving at a dollar value of the land or at a price which a purchaser could afford to pay for the land. As an example of one of the purposes for which the "economic approach" evidence could be considered, the court mentioned the determination of "what is the highest and best use of the land and the feasibility of its use for a given purpose." The court did not limit the admissibility of the evidence to those purposes, but merely struck it from the record insofar as it purported to support a specific dollar value of the land. Contrary to plaintiff's claim, the court did not tell the jury to *completely* disregard the economic analysis evidence.

The court committed no error in striking the evidence, including the exhibit, within the abovementioned limitations. The damages to be awarded in an eminent domain proceeding for the land condemned must be measured by the market value of the land in view of all the purposes to which it is naturally adapted and evidence of value in terms of the money which the land would bring for a specific purpose or as a result of a projected specific plan of development is not admissible as an element in determining such market value. (*Sacramento Southern R.R. Co.* v. *Heilbron, supra,* 156 Cal. 408, 412; *Long Beach City H. S. Dist.* v. *Stewart, supra,* 30 Cal.2d 763, 772; *East Bay Mun. Utility Dist.* v. *Kieffer* (1929) 99 Cal.App. 240, 250-251 [278 P. 476, 279 P. 178]; *People* ex rel. *State Park Com.* v. *Johnson, supra,* 203 Cal.App.2d 712, 716-717.)

*Severance damages in regard to George Silveira's property.*

Finally, plaintiff contends that the court erred in instructing the jury that George Silveira's separately owned parcel would be landlocked as a result of the condemnation and in striking testimony of plaintiff's valuation witnesses based on an assumption that George Silveira could obtain access over and across the surrounding lands owned by all the Silveiras, including George, in cotenancy.

It will be recalled that defendant George Silveira owned a .6 acre parcel, lying entirely within the 260 acres, together

with a 40-foot nonexclusive easement extending therefrom across the jointly owned land to U.S. Highway 101. Generally speaking, defendants' valuation witnesses were of the opinion that the parcel, left with no access, would be of minimum value to any purchaser and testified to severance damages ranging from $21,700 to $27,713. Plaintiff's witnesses on the other hand were of the opinion that George Silveira would suffer no severance damages at all since it could be assumed that he would have access to the newly constructed interchange over the jointly owned property or would be given a right-of-way over the surrounding property.

It is first argued that the court's ruling and instructions failed to consider the cotenancy rights of George Silveira in the surrounding lands. The argument is without merit. An examination of the pertinent instruction[21] convinces us that the court properly instructed the jury as to such rights. "A tenant in common cannot create an easement or servitude upon the common land." (*Pfeiffer* v. *Regents of University of California* (1887) 74 Cal. 156, 162 [15 P. 622]; *East Shore Co.* v. *Richmond Belt Ry.* (1916) 172 Cal. 174, 178 [155 P. 999].) Plaintiff asserts that as a co-owner, George Silveira had an absolute right to bring an action in partition (citing Code Civ. Proc. § 752 and *De Roulet* v. *Mitchel* (1945) 70 Cal.App.2d 120, 124 [160 P.2d 574]). Plaintiff did not request any specific instructions dealing with such right to partition or dealing with the right to have a way, road or street set apart for the benefit of his newly partitioned property (under Code Civ. Proc. § 764 upon which plaintiff now relies) or dealing with the right to partition under the last-cited section in a situation conjured up by plaintiff where he would convey to a third person both his

---

[21]The court instructed the jury as follows: "Defendant George Silveira was the owner of an easement of way, appurtenant to his separately owned parcel, over part of the land being taken and part of the land not taken, which easement gave his separate land ingress and egress to and from the highway.

"The taking of some of the land underlying that easement will destroy his separate land's ingress and egress. This is a damage for which George Silveira is entitled to compensation. George Silveira, as a cotenant of the other lands, cannot create an easement in the commonly owned lands against his co-tenants or for the benefit of his adjoining but separately owned property, although as a co-owner of the surrounding property he had and continues to have the personal right at all times to enter and cross the lands owned in common, even for the purpose of entering and leaving the lands solely owned by him. Therefore, by reason of the taking of the forty foot easement of access appurtenant to defendant George Silveira's separately owned property it will be without access to any public roadway."

separately owned property and "a specific tract by metes and bounds out of the common land." All of these points are presented for the first time on appeal and should be dealt with accordingly. The testimony which was struck did not refer to any of the above rights but merely assumed that George would be *given* an easement over the jointly owned property by his relatives.

Plaintiff next argues that the jury was entitled to infer from the family relationship that George's property would not be landlocked. Such relationship, however, did not support the inference that George would acquire a gratuitous right-of-way.

Finally, the argument is made that George's parcel would not be landlocked, should he sell it because of the right of any vendee to acquire a right-of-way by eminent domain proceedings pursuant to Civil Code section 1001 and Code of Civil Procedure section 1238. However, plaintiff's valuation witnesses did not predicate their opinion on the existence of such right, which carries with it the duty to pay a reasonable price. They unrealistically speculated that a right-of-way could be acquired at *no* cost to George and offered the jury *no* figures which the theories advanced before us would support as representing severance damages.

The judgment is affirmed.

Molinari, J., and Bray, J.,* concurred.

A petition for a rehearing was denied September 10, 1965, and appellant's petition for a hearing by the Supreme Court was denied November 10, 1965. Traynor, C. J., was of the opinion that the petition should be granted.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.