[Civ. No. 22755. First. Dist., Div. One. Oct. 20, 1966.]

COUNTY OF SANTA CLARA, Plaintiff and Appellant, v. W. W. CURTNER, as Executor, etc., et al., Defendants and Respondents.

Spencer M. Williams, County Counsel, John R. Kennedy, Acting County Counsel, and James A. Ersted, Deputy County Counsel, for Plaintiff and Appellant.

Thorne, Stanton, Clopton, Herz & Stanek, Thorne, Stanton, Clopton, Herz, Stanek & Steinberg, John E. Thorne and Elliott G. Steinberg for Defendants and Respondents.

SIMS, J.—Plaintiff, County of Santa Clara, as condemner, has appealed from a judgment awarding the sum of $70,370, plus costs, for property taken from defendants Ginden as condemnees[1] for a freeway and for severance damages to their remaining property. The jury awarded $32,850 for the property taken, and $37,520 for severance damages. It is only the latter sum which is in controversy. Plaintiff contends on appeal that the court erred in receiving and in failing to strike evidence of severance damages which was predicated upon assumptions not authorized by law; and in ruling that the property remaining consisted not only of the parcel severed but also included a contiguous parcel which the condemnees had purchased some years before. Complaint is also made that the provisions of the judgment concerning the disposition of the proceeds of the award are not sustained by the evidence.

*The Property Involved*

The property involved in this action is L-shaped. The base consists of a rectangle approximately 540 feet by 422 feet. The easterly 30 feet of this rectangle was subject to an easement for Sierra Vista Avenue, a public street running approximately north and south terminating on its entrance into Alma Street at the southeast corner of the property. Alma Street

---

[1]The complaint names W. W. Curtner, executor of the Estate of John F. Gomes, deceased, as a codefendant. At the time the action was filed the sole interest of the estate was in securing payment of the balance due on the purchase price of the property pursuant to the terms of an option which was exercised after the death of Gomes, but prior to the institution of the condemnation action.

bordered the property for the remaining 510 feet on the south. The stem of the L consists of a second rectangle which projects northerly approximately 398 feet where it is bounded by Hackett Avenue, a blind street, which runs from the northwest corner of the property easterly along the property line for about 265 feet and thence on approximately 245 feet to Sierra Vista Avenue.

The property the subject of condemnation was a parcel along the north side of Alma Street, the base of the L, about 82 feet deep on the east and 94 feet deep on the west, and a portion of the right-of-way in Sierra Vista Avenue. No claim was made for any damage for taking the latter because it was already subject to an easement. The net amount carved out of the southerly portion of the property was 1.033 acres together with all right of access to Alma Street, either from the property or over Sierra Vista Avenue which was to be closed off as part of the improvement in making Alma Street a freeway.

In 1959 the entire property was owned by John F. Gomes. At that time condemnee Ginden negotiated with him for the purchase and sale of all the property. As a result of these negotiations Gomes sold and the Gindens purchased that portion of the property constituting the stem of the L, and Gomes granted the Gindens an irrevocable option, which extended until thirty days after his death, to purchase the balance of the property.

On August 30, 1962, the northerly portion of the property which was owned by the Gindens was incorporated into the City of Mountain View at their request. In November 1962 the county in planning for the freeway caused a record of survey map to be prepared of the lands of Gomes which set forth only the rectangle subject to the option. This map was recorded April 25, 1963.

On August 19, 1963, Gomes died and on September 16, 1963 the Gindens gave notice of their election to purchase the property. The transaction was approved by the probate court and was closed about January 30, 1964. In November or December 1963, after exercising the option, the Gindens commenced proceedings to annex the remaining property to the city. These proceedings culminated in annexation February 27, 1964.

Meanwhile, on November 12, 1963 the county passed its resolution to condemn the strip adjacent to Alma Street. Action was filed and summons issued on January 10, 1964.

The county contended at the pretrial conference that it was seeking 1.033 out of 5.23 acres, the approximate area of the southerly rectangle. Defendants, however, contended that the take was from a total of approximately 7.50 acres, the entire property.

At the trial the court accepted the condemnees' offer to prove that the total area of their property was approximately 7.50 acres, and overruled plaintiff's objections.

■ The applicable principles were recently reviewed in *People* ex rel. *Dept. Public Works* v. *Fair* (1964) 229 Cal.App. 2d 801 [40 Cal.Rptr. 644], wherein the opinion concludes: "The problem of what constitutes a single parcel of land in the contemplation of [Code Civ. Proc.] section 1248 is essentially a question of law (*City of Oakland* v. *Pacific Coast Lumber & Mill Co.*, 171 Cal. 392 [153 P. 705]).

". . . our courts, like those of most jurisdictions, have consistently held that unity of title, unity of use and contiguity are required *People* v. *Bowers*, 226 Cal.App.2d 463 [38 Cal.Rptr. 238]; *People* v. *Ocean Shore R. R. Inc.*, 32 Cal.2d 406 [196 P.2d 570, 6 A.L.R.2d 1179]; *City of Oakland* v. *Pacific Coast Lumber & Mill Co.*, supra; *Atchison, T. & S. F. Ry.* v. *Southern Pac. Co.*, 13 Cal.App.2d 505 [57 P.2d 575]; *East Bay Municipal Utility Dist.* v. *Kieffer*, 99 Cal.App. 240 [278 P. 476, 279 P. 178]; *City of Stockton* v. *Ellingwood*, 96 Cal.App. 708 [275 P. 228])." (229 Cal.App.2d at p. 804; in addition to cases cited see: *People* v. *Thompson* (1954) 43 Cal.2d 13, 18-26 [271 P.2d 507]; *People* ex rel. *Dept. of Public Works* v. *Dickinson* (1964) 230 Cal.App.2d 932, 934 [41 Cal.Rptr. 427]; *People* ex rel. *Dept. of Public Works* v. *City of Los Angeles* (1963) 220 Cal.App.2d 345, 461 [33 Cal.Rptr. 797]; *City of Menlo Park* v. *Artino* (1957) 151 Cal.App.2d 261, 269-271 [311 P.2d 135]; *County of San Benito* v. *Copper Mt. Min. Co.* (1935) 7 Cal.App.2d 82, 86 [45 P.2d 428]; *City of Stockton* v. *Marengo* (1934) 137 Cal.App. 760, 765-767 [31 P.2d 467]; 29A C.J.S., Eminent Domain, § 140, p. 589; 27 Am.Jur.2d, Eminent Domain, § 315, p. 134; Annotation, 95 A.L.R.2d 887; Condemnation Practice (Cont. Ed. Bar 1960) Severance Damages, section C, pp. 66-67; 4 Nichols, Eminent Domain, Consequential Damages, § 14.31, pp. 715-735; 3 Witkin, Summary of Cal. Law (1960) Constitutional Law, § 237, p. 2046.)

■ In the instant case there is no question but that the two parcels involved are contiguous. The county attacks the unity of title by asserting: "The holder of a mere option to

purchase land being condemned is not entitled to any part of the compensation to be paid therefor. [Citations.]'' (*East Bay Mun. Utility Dist.* v. *Kieffer* (1929) 99 Cal.App. 240, 246 [278 P. 476, 279 P. 178]; and see *People* v. *Ocean Shore R. R. Co.* (1949) 90 Cal.App.2d 464, 469 [203 P.2d 579]; *Los Angeles County Flood Control Dist.* v. *Andrews* (1921) 52 Cal.App. 788, 791 [305 P. 1085].) The case on which it relies correctly notes: ''Of course, if the lands under option had been held under a contract obligating the defendant to purchase then a different rule would apply.'' (99 Cal.App. at p. 247.) Such is the situation here. The uncontradicted evidence shows that the Gindens had exercised the option and were the equitable owners of the property condemned at the time the action was commenced.

The county also asserts that the ruling of the trial court violated the rule which prohibits consideration of potential joinder of parcels in regard to severance damages, as distinguished from the principle which allows so-called ''assemblage'' in determining the value of the land taken. (Cf. *People* v. *Ocean Shore R. R., Inc.* (1948) 32 Cal.2d 406, 424 [196 P.2d 570, 6 A.L.R.2d 1179], with *County of Santa Clara* v. *Ogata* (1966) 240 Cal.App.2d 262, 268-269 [49 Cal.Rptr. 397].) There was no potential ''assemblage'' in this case. The parcels were contiguous and already in common ownership at the time the action was filed.

It was determined at the pretrial conference that the highest and best use of the property was for multiple residential development. ▮ The unity of use had not been perpetually destroyed because the former owner reserved a portion of the land for himself subject to the Gindens' option. The trial judge correctly appraised the situation in connection with argument addressed to him on motion for new trial when he stated, ''the thing was all one parcel and the old man just wanted to keep something to live on. It was all one place and was just put back together again.'' (See *City of Stockton* v. *Marengo, supra,* 137 Cal.App. 760, 765-767 and *City of Stockton* v. *Ellingwood* (1929) 96 Cal.App. 708, 744-746 [275 P. 228].)

*Severance Damages*

The principal controversy in this case stems from action taken by the City of Mountain View in connection with planning for future development in the light of the establishment of the county freeway.

County asserts that the trial court erred in admitting and in refusing to strike (1) evidence of precise plan lines for new streets which would in part traverse a portion of the remainder of the property involved, and (2) evidence of the cost of improving that portion of such streets. It asserts that the damages, if any, attributable to the development plans of the city are collateral and not direct and proximate results of the taking by the county, and that the condemnees if damaged thereby should seek recourse from the city. The condemnees assert with equal vehemence that the evidence was properly admitted because all factors which affect the market value of the remainder, and which flow from the taking, properly may be considered in determining severance damages to the remainder.

A proper appraisal of this dispute necessitates scrutiny of the action taken by the city, the evidence actually received, and the legal principles governing the proof of severance damages.

The record reflects that the proposed freeway was part of a program of construction for which the voters approved a bond issue in 1961. Thereafter it was common knowledge that the freeway would affect property and streets abutting on Alma Street. In November 1962 a map of the precise take proposed for the Gomes' property was prepared, and it became a matter of public knowledge when recorded April 25, 1963.

On June 26, 1963, a staff report to the Mountain View Planning Commission set forth a proposed plan for the development of Hackett Street and its proposed minor tributaries in order to relieve critical access and public safety problems which would result in the near future in the area north of Alma Street and west of Rengstorff Avenue, the street parallel to Sierra Vista Avenue, which intersected Alma some 700 feet west of the Gindens' property.[2]

[2]The report recites: "The area north of Alma and west of Rengstorff Avenue now has an incomplete street system. Because this area was recently annexed and given multiple-family zoning, development is taking place rapidly. The Central Expressway will cut off access at Alma Street and the failure to provide a street circulation system will result in critical access and public safety problems in the near future. Accordingly, the completion of Hackett and its minor tributaries is essential before development closes off all practical access possibilities.

"The proposed plan is recommended by the Staff. It provides an adequate space between the intersections on Rengstorff Avenue, even with a future overpass at Alma Street and Rengstorff."

The map approved by the planning commission at the hearing on this report, and the map ultimately approved by the city council on October 14, 1963 both reflect that the property along the northerly edge of Alma Street (the proposed freeway) west of condemnees' property would be

The matter was continued to July 10, 1963 at which time the staff submitted a map of the proposal. The minutes of the city planning commission reflect that a public hearing was held two weeks later and the planning commission recommended a plan which proposed a 50-foot right-of-way along the southerly portion of so much of the condemnees' property as would remain after the proposed take by the county, a 60-foot right of-way northerly extending 30 feet into the westerly edge of the condemnees' property and 30 feet into the neighboring property, and an increase in the width of Hackett Avenue by taking five feet from the property on each side of the street, including the northerly frontage of condemnees. It was recommended that circulation be obtained by extending Hackett on a jog to the west to connect with Rengstorff, or, alternatively, that the right-of-way continue north from the intersection of Hackett and the proposed north-south street, at the northwesterly corner of condemnees' property, to Montecito Avenue, the next east-west street.[3]

On July 29, 1963, the city council set hearing on the recommended precise plan for August 12, 1963. Notice of this hearing was mailed to Gomes and to the Gindens. At the hearing the only argument reported was in connection with whether the proposed street should proceed northerly or

used for a deacceleration lane and off-lane to Rengstorff, and would not be available for a continuation westerly of the 50-foot right-of-way which was proposed along the southerly portion of their property.

[3]The letter of transmittal recites: ''At the present time, Hackett Avenue comes to an abrupt deadend about 700 feet short of Rengstorff Avenue. This area has been recently annexed to the City and is zoned for high-density residential use. The land in the area is now undergoing development for multiple-family residences. The traffic to be generated by the increased number of families dictates the completion of this road system.

''The Central Expressway will cut off in its later stages Sierra Vista Avenue and all access along Alma Street. Furthermore it is anticipated that an overcorssing [sic] at Rengstorff will be required and consequently more traffic will be pushed onto Hackett Avenue. Accordingly, in view of the eminent [sic] development in the area, it is deemed appropriate to establish routes for the completion of this street system at as early a date as possible. The Planning Commission has considered a number of alternatives and finds that it is desirable, in addition to providing a loop from Hackett Avenue to Sierra Vista, to provide for the westerly extension of Hackett to Rengstorff. This should be accomplished in as northerly a position as possible in order to minimize interference with a crossing. The route has been shown along a common property line wherever possible.

''It was part of the Planning Commission's recommendation that should it not be possible to carry this route westerly to Rengstorff, a second alternative would be to extend Hackett Avenue as a 60 foot street to Montecito Avenue.''

westerly from the existing western terminus of Hackett. The council concluded: ''that an extension into Montecito Avenue would be less costly and would curtail additional traffic flow into Rengstorff Avenue.'' The matter was referred back to the planning commission for further study.

On September 11, 1963, the planning commission recommended a plan extending into Montecito Avenue. The letter of transmittal to the city council recites in part: ''The map shows Madera Avenue on the south, with a 50 foot width. This provides for service to the northerly properties only. The map provides for Montebello Avenue at 60 feet in width, . . . The Commission also considers that the cost of this route represents the best possible alternative, consistent with meeting the transportation needs in this area.''

The matter was set for hearing before the city council on October 14, 1963 and notices were mailed to Gomes, now deceased, and the Gindens. The minutes recite the subject: the ''recommendation of the Planning Commission that the City Council adopt a Precise Plan Line for a new street in the Hackett Avenue area, said area bounded by Rengstorff, Sierra Vista, Montecito Avenue and Alma Street.'' They continue: ''The Director of Planning pointed out development of the County Expressway which would cut off access to the property at the southerly side. The plan as presented showed Madera Avenue, a street running east and west from Sierra Vista to Montebello. Montebello extends northerly, connecting with the terminus of Hackett Avenue, going on northerly to end at Montecito Avenue. Montebello would have a 60-foot right of way, . . . No one else [other than an attorney for other properties] came forth to be heard on the Plan Line and there were no written communications received.'' A resolution was thereupon adopted approving the plans, which affected the property of condemnees as first outlined above.

In February 1964 an ''Official Map of Planned Right Of Way'' predicated on the foregoing resolution was prepared, and a copy thereof was recorded on March 17, 1964.

It was established by the pretrial order that the property was zoned for agricultural uses at the time suit was filed and before its incorporation into the city, but that the highest and best use of the property would be multiple residential. All of the witnesses echoed the latter conclusion. The evidence demonstrated that it would be necessary to annex to the city to improve the property with a multiple residential development in order to secure certain utilities which otherwise were

unavailable; and that the applicable city zoning required 5,000 square feet for the first unit and 2,200 square feet for each additional unit. (It does not appear whether this ratio ran true regardless of the size of the tract or whether further open spaces or roadways would be required under such circumstances.)

The condemnee testified without contradiction that before the impending construction of the freeway forecast that there would be no access to Alma Street, he had been advised by city officials that a development on the whole of the property would be approved if he gave and improved five feet on Hackett Avenue, and improved 15 feet on Sierra Vista Avenue, and 30 feet on Alma Street.

The condemnees' first witness found that the property as a whole had a fair market value of $.75 per square foot on January 10, 1964 on the basis of the market data approach. He fixed a value of $239,300 for 7.324 acres of net usable property before the take; and a value of $33,750 on the 1.033 acres actually taken. In order to compute the severance damages he attributed the same value to the remainder of 6.291 acres before the take, or approximately $205,527. In order to get the value of the remainder after the take he found a total reduction in the fair market value of all of the property by reason of the taking of $106,000, of which $33,750 was attributable to the actual taking, and the remainder, or $72,250, to severance damages.

County alleges error in the methods whereby the appraiser arrived at the last figure. Analysis of the appraiser's testimony reflects that the validity of the $72,250 figure is dependent upon the $106,000 figure, which in turn is predicated upon a $133,300 figure, which the witness testified would in effect be the fair market value of the remainder after the take.

To arrive at this figure the witness, over plaintiff's objection, referred to the precise street plan adopted by the city and reduced the 6.291 acres remaining by the area prescribed for streets to a net usable area of 5.238 acres. The value of this acreage, $171,125 at $.75 a square foot, was merely a starting point for an appraiser's legerdemain whereby after resorting to unit costs which a developer would consider he arrived at the aforementioned conclusion as to the fair market value after the take. A peek under the magician's scarf reflects that the severance damages to which the witness testified actually consist of $34,900 attributable to the value of the acreage embraced in the roadways established by the city's precise

plan, and \$37,350 attributable to development costs in excess of those which concededly would have been attributable to the net property remaining if there had been no condemnation.[4]

The second witness similarly discounted the property for the value of the portion embraced in the plan lines and the estimated costs of improving the streets.[5]

County objects to the admission of evidence of either the

[4]

| AREA | GROSS AMOUNT | UNIT PRICE |
|------|-------------|------------|
| 1. 7.324 Acres (143 Units) | \$239,300* | \$1,673* |
| 2. Site Development cost | 47,900* | 335 |
| 3. Projected investment | \$287,200* | \$2,008* |
| 4. 1.033 Acres Taken (20 Units) | \$ 33,750* | |
| 5. 6.291 Acres—Remainder (Before) | \$205,550* | |
| 6. 1.053 Acres–Plan Lines (21 Units) | \$ 34,425 | |
| 7. 5.238 Acres (102 Units) | \$171,125* | |
| 8. Site Development Cost | 71,000* | |
| 9. Gross projected cost | \$242,125* | \$2,374* |
| 10. Maximum Investment (102 Units) | \$204,816 | \$2,008* |
| 11. Difference (102 Units) | \$ 37,332 | \$ 366* |
| 12. Revised Land Price (line 1—line 11) | \$133,314* | \$1,307* |
| 13. Severance Damage (line 5—line 12) | \$ 72,236* | |
| 14. Acknowledged site development (line 2) | \$ 47,900 | \$ 335 |
| 15. Portion in line 10 (102 Units) | \$ 34,170 | \$ 335 |
| 16. Portion in line 11 (102 Units) | \$ 13,730 | \$ 135 |
| 17. Actual Additional Cost (line 8—line 2) | \$ 23,100 | \$ 226 |
| 18. Adjust Excess sq. ft. cost (line 7 over unit cost line 10) | \$ 479) | \$ 5 |
| 19. Adjust unit variations | \$ 23) | |
| 20. Deductions from unit land value (line 11) | \$ 37,332 | \$ 366 |
| 21. Land omitted at sq. ft. value (line 6) | \$ 34,425 | |
| 22. Adjust (see line 18) | \$ 479 | |
| 23. Damages attributable to plan lines | \$ 34,904 | |
| 24. Damages attributable to additional development costs | \$ 37,332 | |
| 25. Total Severance Damages | \$ 72,236 | |

[5]

| | |
|---|---|
| 1. Total area—143 Units at \$2,000 per unit price for developed land | \$286,000 |
| 2. Less estimated development cost | \$ 48,000 |
| 3. Net Value | \$238,000 |
| 4. Value attributable to 1.033 acre take | \$ 33,570 |
| 5. Remainder before take | \$204,430 |
| 6. Total area 102 units at \$2,000 per unit | \$204,000 |
| 7. Less estimated development cost | \$ 71,000 |
| 8. Net value | \$133,000 |
| 9. Severance damages (line 5—line 8) | \$ 71,430 |

*Figures used by appraiser.

plan lines, or the costs of improvements on numerous grounds. In order to put these objections in proper perspective it is necessary to review the established legal principles governing this type of case.

██ "It has long been recognized in this state and elsewhere that an owner of property abutting upon a public street has a property right in the nature of an easement in the street which is appurtenant to his abutting property and which is his private right, as distinguished from his right as a member of the public. That right has been described as an easement of ingress and egress to and from his property or, generally, the right of access over the street to and from his property, and compensation must be given for an impairment thereof. We are not now inclined to question or disturb that rule. [Citations.]" (*Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 349-350 [144 P.2d 818]; and see *People* ex rel. *Dept. of Public Works* v. *Lipari* (1963) 213 Cal.App.2d 485, 489-490 [28 Cal.Rptr. 808]; *People* ex rel. *Dept. of Public Works* v. *Silveira* (1965) 236 Cal.App.2d 604, 613 [46 Cal.Rptr. 260]; *People* ex rel. *Dept. of Public Works* v. *Russell* (1957) 48 Cal.2d 189, 195 [309 P.2d 10].)

██ In computing severance damages, and in this case the loss of access must be considered as such, the general rule is that the damages are the difference between the fair market value of the remaining property before the taking, and the fair market value of the same property after the taking and the construction of the improvement in the manner proposed. (*Sacramento etc. R. R. Co.* v. *Heilbron* (1909) 156 Cal. 408, 414 [104 P. 979]; *People* v. *Hayward Bldg. Materials Co.* (1963) 213 Cal.App.2d 457, 464 [28 Cal.Rptr. 782]; *People* ex rel. *Dept. of Public Works* v. *Silveira, supra,* 236 Cal.App.2d 604, 617.)

██ "The damages to be awarded in an eminent domain proceeding for the land condemned must be measured by the market value of the land in view of all the purposes to which it is naturally adapted and evidence of value in terms of the money which the land would bring for a specific purpose or as a result of a projected specific plan of development is not admissible as an element in determining such market value." (*People* ex rel. *Dept. of Public Works* v. *Silveira, supra,* 236 Cal.App.2d 604, 627.)

██ Nevertheless it is recognized that there is a "cost to cure" theory of severance damage value, to wit: "that as to the property not taken, the cost of necessarily relocating

improvements on the land not taken so as to place the owner as nearly as possible in the position he was before the front of his property was taken, might be considered on the question of the difference in fair market value before and after the taking.'' (*City of Riverside* v. *Kraft* (1962) 203 Cal.App.2d 300, 303 [21 Cal.Rptr. 425] ; and see *People* v. *Hayward Bldg. Materials Co., supra,* 213 Cal.App.2d 457, 465-467.)

It is unnecessary to determine whether under the last doctrine the damages for loss of access may be arbitrarily equated with the cost of providing a substitute street. The evidence produced by the condemnee is open to the interpretation that it does give opinions as to the respective market values before and after the taking, and that the cost figures used are merely reasons and explanations for those ultimate figures.

''All courts recognize that the reasons given by an expert may be of utmost importance in weighing the value of the opinion given. All of the varying circumstances and elements which a reasonable person would consider in arriving at the final test of difference in fair market value, including items which fairly afford a test of the accuracy of the reasons given by the expert appraisers in arriving at their ultimate conclusions of value, are properly subject of evidentiary proof. Only in this way can the trial court intelligently test the value or weight of the experts' opinion on the ultimate difference in fair market value. [Citations.] '' (*City of Riverside* v. *Kraft, supra,* 203 Cal.App.2d 300, 304-305.)

The physical features of the plan and the cost of executing it were therefore properly received as an explanation of the testimony of the appraisers as to the before and after fair market value of the property. The critical issue is whether proof that the city had adopted the plan furnished a proper basis for such purposes, or whether on its face it demonstrated that condemnees acquired the property subject to burdens for which they could not seek recompense from the condemner. Before discussing this matter, other procedural objections of county should be noted and interred.

County points out that the ordinances of the city cannot be effective on or in relation to property which lies outside the territorial limits. This is true as a general proposition. (Cal. Const., art. XI, § 11; see *City of Oakland* v. *Brock* (1937) 8 Cal.2d 639, 641 [67 P.2d 344] ; *City of South Pasadena* v. *Los Angeles Terminal Ry. Co.* (1895) 109 Cal. 315, 321 [41 P. 1093] ; *City of South San Francisco* v. *Berry* (1953)

120 Cal.App.2d 252, 253 [260 P.2d 1045]; and *Miller* v. *Fowle* (1949) 92 Cal.App.2d 409, 411-412 [206 P.2d 1106].) The Legislature, however, has recognized that proper local planning may embrace territory outside the jurisdiction of the entity. Section 65460 [65300][6] of the Government Code as in effect in 1963 and 1964 defines the territorial scope of a general plan as extending to "any land outside its boundaries which in the commission's [planning agency's] judgment bears relation to its planning." It is contemplated that such a plan will embrace "A circulation element consisting of the general location and extent of existing and proposed major thoroughfares, transportation routes, terminals, and other local public utilities and facilities, all correlated with the land use element of the plan." (Gov. Code, § 65462, subd. (b) [§ 65302, subd. (b)]; and see §§ 65466, 65551; and 65703 [§§ 65303, subd. (c); 65402, subd. (a); and 65552].) It is obvious that the city planning commission and the city council in adopting the precise plan and extending it to territory bordering on the city were properly exercising powers granted to them by the Legislature. (See Gov. Code, §§ 65508, 65600, and 65656 [65357, 65450 and 65503].)

 County suggests that reference to the adoption of the precise plan by the city was improper because it was not shown, as prescribed by law, that the city had adopted the local planning provisions of the Government Code by ordinance or charter. (Gov. Code, § 65304 [65700].) It also claims that in any event there was no showing that the city had cooperated with the county which had territorial jurisdiction over a portion of the land embraced in the precise plan (Gov. Code, § 65475 [65304]), or that it had certified a copy of it to the county planning commission. (Gov. Code, § 65476 [65305].) It suffices to say that the condemnees are aided by the presumption that official duties have been regularly performed. (Code Civ. Proc., § 1963, subd. 15 [Evidence Code, § 664].) No showing was made that the city had not elected to come within the general law, or that it had failed to comply with it. Moreover, the question in this action is not whether the city had the power and authority to adopt such a precise plan, but the effect on the judgment of a hypothetical

[6]Chapter 3 of title 7 of the Government Code, sections 65090-65715, dealing with "Local Planning" was repealed by Stats. 1965, ch. 1880, § 8, and the provisions thereof were revised and reenacted by section 5 of the same statute in sections 65100-65700. The corresponding sections of the latter statute are indicated in brackets.

purchaser of the adoption of the plan regardless of whether such action was authorized or ultra vires.

■ The fact that the plan lines could not bind the property until it was annexed to the city, an event which only occurred as to the greater portion of the property more than six weeks after the action was filed, is not determinative of the relevancy and competency of proof of the city's regulations. "Where the land is not presently available for a particular use by reason of a zoning ordinance or other restriction imposed by law, but the evidence tends to show a 'reasonable probability' of a change in the near future, the effect of such probability upon the minds of purchasers generally may be taken into consideration in fixing present market value. [Citations.]" (*People* v. *Dunn* (1956) 46 Cal.2d 639, 642 [297 P.2d 964]; and see *Long Beach City H. S. Dist.* v. *Stewart* (1947) 30 Cal.2d 763, 768 [185 P.2d 585, 173 A.L.R. 249]; *People* ex rel. *Dept. of Public Works* v. *Graziadio* (1964) 231 Cal.App.2d 525, 530 [42 Cal.Rptr. 29]; *County of Santa Clara* v. *Ogata, supra*, 240 Cal.App.2d 262, 269-270.)

County asserts that the plan lines should not have been considered because there was no assurance that the contemplated streets would ever be put in, or if so, under what terms.

■ "To recover severance damages under section 1248, subdivision 2, of the Code of Civil Procedure, the loss in market value claimed must directly and proximately flow from the taking. Damage which is speculative, remote, imaginary, contingent, or merely possible, or damage caused by competition, or recovery in advance for torts or other injuries that may or may not be committed cannot serve as a legal basis for recovery. [Citations.]" (*Arnerich* v. *Almaden Vineyards Corp.* (1942) 52 Cal.App.2d 265, 272 [126 P.2d 121].)

"The mere threat or possibility of construction of a public work is not actionable." (*Heimann* v. *City of Los Angeles* (1947) 30 Cal.2d 746, 754 [185 P.2d 597]; and see *Hilltop Properties, Inc.* v. *State of California* (1965) 233 Cal.App.2d 349, 356-361 [43 Cal.Rptr. 605].) The mere passage of an ordinance establishing a grade which would cut off a property owner's access does not give rise to an action for damages. The damage can only arise when the work was done. (*Eachus* v. *Los Angeles etc. Ry Co.* (1894) 103 Cal. 614, 621-622 [62 P. 829, 80 Am.St.Rep. 147].) ■ In the present case, however, the damage allegedly flows from the county's taking the access to Alma Street. The plan is offered, not to show damage

by loss of the property embraced in the street plan per se, but to show it as a factor which affects the utility and market value of the remaining property in the mind of a hypothetical purchaser.

 County further claims that the Gindens are barred from asserting any severance damages by reason of the plan lines because they exercised the option with full knowledge that the freeway would cut off access to the property and the city would require the street plan. It further asserts that in seeking annexation they voluntarily submitted to subjecting their property to the city's plan.

 In general "where property is purchased which is subject to pending condemnation proceedings and the deed conveying said property is silent as to the award money to be paid in the proceedings, said money belongs to and is payable to the purchaser. [Citations.]" (*Brick* v. *Cazaux* (1937) 9 Cal.2d 549, 554 [71 P.2d 588].) From the foregoing it is clear that if the transfer of interest in the property had occurred after January 10, 1964, the Gindens would have been entitled to all the damages which accrued to their predecessor at the date of the issuance of summons. The fact that condemnation was threatened should not put them to the option of abandoning their option, or waiving damages if it was exercised. Such a result would unjustly enrich the condemner. When the Gindens exercised the option they had a right to expect to be able to resell the property at its fair value in a market untainted by the influence of the threatened condemnation, or to be compensated if the condemnation in fact eventuated. Similarly they were free to annex or not to annex to the city for whatever reason seemed sufficient to them without thereby waiving any claim for damages which might arise by reason of the taking.[7] Nor contrariwise, as hereinafter discussed, can they by annexing to the city increase their claim for damages.

The remaining contentions made by county go to the crux of the controversy. To what extent are the plan lines and contemplated improvements peculiar to the property from which the land taken was carved, and to what extent are they occasioned in order to rectify a condition which the construc-

---

[7]There is nothing to indicate that dedication of the street areas delineated in the precise plan was a price of annexation, as distinguished from a possible future condition of development. Compare *Brick* v. *Cazaux* (1937) 9 Cal.2d 549, 555 [71 P.2d 588], wherein dedication was found to have divested the purchasers of the right to recover an award for the taking which had been collected by their vendor.

tion of the improvement has inflicted on all the land in the neighborhood and to the public in general?

County equates the plan lines with zoning or other exercise of the police power by the city. ▆▆ When property is restrictively zoned so as to preclude a more profitable use, the condemnee cannot show its value for the latter use in the absence of evidence to show reasonable probability of a change in zoning which would abolish the restriction. (*Long Beach City H. S. Dist.* v. *Stewart, supra,* 30 Cal.2d 763, 766-768; and see *People* ex rel. *Dept. of Public Works* v. *Graziadio, supra,* 231 Cal.App.2d 525, 529; *City of La Mesa* v. *Tweed & Gambrell Planing Mill* (1956) 146 Cal.App.2d 762, 768 [304 P.2d 803]; *City of Beverly Hills* v. *Anger* (1932) 127 Cal.App. 223, 226-228 [15 P.2d 867]; *Los Angeles City H. S. Dist.* v. *Hyatt* (1926) 79 Cal.App. 270, 272 [249 P. 221].)

▆▆ So here it is urged that the restriction on the use of the property imposed by the precise plan lines does not constitute a source of damage accuring to the property by reason of the condemnation of a part thereof. The county asserts that the restriction and ensuing damage, if any, are occasioned solely by the city's exercise of its police power, and that the county cannot directly or indirectly be assessed therewith. Condemnees counter by pointing out that but for the construction of the improvement in the manner proposed by county, whereby all access to Alma Street is to be cut off, there would be no necessity for such exercise of the city's police power.

In *Graziadio, supra,* the issue was whether a rezoning which liberalized the use of property would have included rather than excluded the property in question if it had not been the subject of contemplated condemnation. The court held it was proper to introduce evidence that the condemner had interceded to request the preservation of the more restrictive zoning, and observed: ''The R-1 zoning was properly admitted in evidence since it has a bearing upon the possible uses of the property, which in turn has a bearing upon the issue of market value. (*City of Beverly Hills* v. *Anger,* 127 Cal.App. 223, 227 [15 P.2d 867].) By the same reasoning, the communication from the Department of Public Works, the plaintiff herein, requesting the R-1 zoning, is relevant since it, too, bears upon the possible uses of the property had there been no taking for highway purposes. The jury was instructed that 'In deciding upon the fair market value of the property taken, you must view and consider the Graziadio property just as though there was no taking for highway purposes.'

"Certainly had there been no taking, there would have been no communication from the Department of Public Works affecting the zoning. Thus, to the extent that the communication from plaintiff Department of Public Works affected the R-1 zoning ordinance that was received in evidence, the communication was relevant and admissible." (231 Cal.App.2d at p. 529.) Here there was no active intercession by the condemner, but the condemnees should be able to show that the restrictions on the use of their property flowed from the construction of the proposed improvement.

The evidence of the plan lines and the cost of the improvement of the streets required by the city should not, however, be determinative of the condemnees' severance damages without qualification. The evidence itself shows that the restrictions imposed on the remaining property were not only to restore access to that portion of the property cut off from Alma Street, but also to create a new general system of traffic circulation for the immediate benefit of all of the properties in the entire block in which the condemnees' property was situated and for the general benefit of all persons using the city's street system. It is concluded, in the light of the principles set forth above, that condemnees were only entitled to severance damages from the county to the extent that the fair market value of their property was depreciated by the loss of access, and that insofar as the city's plan caused further depreciation of that market value the condemnees should be left to recover the excess from the city if and when the area within the plan lines is taken for public streets. Or if they elect to dedicate, and, if necessary, improve the streets in return for whatever advantages the city may offer toward the development of the property, they should not charge the county for the additional expense. Such a result would subsidize the property owner's additional advantages at the expense of the county.

To permit the city's plan to govern the difference in market value of the property before and after the taking is to give the city the right to determine an essential element of the damages. If an alley is condemned for a state or county freeway, can the local authority, by planning a parallel boulevard, enable the landowner to recover the cost of the boulevard from the condemning authority? Conversely, if the local authority plans an entirely inadequate substitute street system to supplement a proposed freeway, would the property owner be precluded from showing that it was inadequate, and that his

damages exceeded what it would cost him to provide the inadequate system?

 It is concluded that such a plan can only be a proper element for consideration in determining the difference in the fair market value of the property before and after the taking, insofar as it embraces improvements necessary to restore the remainder to the situation prevailing before the take. Insofar as the plan is designed to rectify detriment which the freeway improvement has caused to the public as a whole, the individual property owner should look to the planning authority for recompense.

Support for this conclusion is found in those cases which have denied recovery based on the generally diminished property values due to the construction of the freeway on adjoining property. "It is established that when a public improvement is made on property adjoining that of one who claims to be damaged by such general factors as change of neighborhood, noise, dust, change of view, diminished access and other factors similar to the damages claimed in the instant case, there can be no recovery where there has been no actual taking or severance of the claimant's property. (*Bacich* v. *Board of Control,* 23 Cal.2d 343 [144 P.2d 818]; *Rose* v. *State, supra,* 19 Cal.2d 713 [123 P.2d 505]; *Eachus* v. *Los Angeles etc. Ry. Co., supra,* 103 Cal. 614, 617; *Reardon* v. *City & County of San Francisco,* 66 Cal. 492, 506 [6 P. 317, 56 Am.Rep. 109].) Accordingly, in the case at bar, had the parcel for the cul-de-sac not been taken, the defendant would not be entitled to recovery based on the general diminished property values due to the construction of the freeway on adjoining property. It is manifest, then, that the crucial question here is whether the defendants, whose property was taken for purposes other than the construction of the freeway itself, are entitled to compensation, as severance damages, for those impediments to the property resulting from the objectionable features caused by the maintenance and operation of the freeway proper on lands other than those taken from the defendants.

"There appears to be no decision in this state on all fours. In *People* v. *Russell,* 48 Cal.2d 189 [309 P.2d 10], a portion of the defendant's property was condemned in order to relocate a county road made necessary by adjoining highway construction, and upon which the defendant's property abutted. The court denied any recovery for impairment of the defendant's access to the county road, and in so doing held that the effects

of the construction of the state highway were not compensable. More in point is *County Sanitation Dist. No. 2* v. *Averill,* 8 Cal.App.2d 556, wherein the court stated at page 561 [47 P.2d 786] : 'An owner, whose land is being condemned in part, may not recover damages in the condemnation action to the remainder of his land caused by the manner in which the works are to be constructed or operated on the lands of others. *The detriment for which he may recover compensation is that which will result from the operation of the works upon his land alone.* (*Keller* v. *Miller,* 63 Colo. 304 [165 P. 774], and cases cited: *Oregon-Washington R. & Nav. Co.* v. *Campbell,* 34 Idaho 601 [202 P. 1065] ; *Walker* v. *Old Colony etc. R. Co.,* 103 Mass 10 [4 Am.Rep. 509] ; *Cambell* v. *United States,* 266 U.S. 368 [69 L.Ed. 328, 45 S.Ct. 115].)' In that case the plaintiff condemned a right of way for a sewer through the defendant's land abutting on the ocean. It was contended that sewage, deposited in the ocean almost a mile offshore, would cause pollution of the shoreline and the air above. As noted, the court held it to be significant that the objectionable operation of the improvement occurred not on the defendant's condemned lands and denied recovery on that basis. (See also *People* v. *Emerson,* 13 Cal.App.2d 673 [57 P.2d 955].) *If it were conceded in the case at bar, as the defendants contend it should be, that the 'improvement' for which the defendants' property was condemned includes the construction of the freeway proper, nevertheless the defendants would not be entitled to recover under the cases last above cited."* (*People* v. *Symons* (1960) 54 Cal.2d 855, 860-861 [9 Cal.Rptr. 363, 357 P.2d 451] ; italics added; see also: *People* ex rel. *Dept. of Public Works* v. *Wasserman* (1966) 240 Cal.App.2d 716, at pp. 725-726 [50 Cal.Rptr. 95] ; *People* ex rel. *Dept. of Public Works* v. *Elsmore* (1964) 229 Cal.App.2d 809, 811-812 [40 Cal.Rptr. 613] ; *City of Berkeley* v. *Von Adelung* (1963) 214 Cal.App.2d 791, 793 [29 Cal.Rptr. 802].)

In other words, insofar as the city's plan proposes to take or restrict more of the condemnees' property than would be necessary to alleviate the damage to that property alone in order to relieve "critical access and public safety problems" which arise from the construction or proposed construction of improvements on property other than that of the condemnees, the latter must look to the city rather than the condemner for relief. If this were not so, each property owner detrimentally affected by the city's proposed streets would have a right of action against the county, regardless of

any taking by county, because "but for" the construction of the freeway it would not have been necessary to create a new traffic plan by planning for new streets.

From the foregoing conclusion it follows that it would be erroneous to predicate the difference in market value before and after the taking on the cost of complying with the city council's idea of what should be done. Insofar as the cost of such a precise plan in land value and construction costs is consistent with the difference in market value because of the loss of access to the particular parcel involved, proof of the existence of the plan is not necessary to establish that difference. Insofar as the precise plan is inconsistent with the difference to be proved, because its scope exceeds or is less than that necessary to compensate for the damage to the parcel by the taking, proof of its existence would be irrelevant and prejudicial.

It is concluded that the trial court erred in admitting and refusing to strike evidence of value which was predicated upon the adoption of the precise plan. (See *People* v. *Dunn* (1956) 46 Cal.2d 639, 641 [297 P.2d 964] ; *People* v. *Al. G. Smith Co., Ltd.* (1948) 86 Cal.App.2d 308, 311-313 [194 P.2d 750] ; *County of Los Angeles* v. *Signal Realty Co.* (1927) 86 Cal. App. 704, 709, 710 [261 P. 536].) Was this error prejudicial on the record in this case ?

*Prejudice*

The jury's award of $32,850 for the 1.033 acres taken neatly fitted with the testimony received, and practically represents the average of the per acre prices given by the appraisers. In awarding $37,520 severance damages the jurors obviously rejected each of the theories propounded by the expert witnesses who gave figures of $72,250, $71,430 and $8,000, respectively, and also disregarded the $110,000 to $115,000 total damage figure to which Ginden testified. One can speculate that the jury considered 1.053 acres, which the evidence reflected would be required for additional street development by reason of the severance under the city's plan, and used it as a measure of the depreciation of the remainder at a value approximately equivalent to that used to compute the fair market value of the 1.033 acres which were actually taken.

There is some competent testimony to support this approach because the condemnees' appraisers indicated that the construction of such a street system would be necessary even though it was not dictated by the city. The condemner's

appraiser, however, brought out that no one could predict in what manner the eventual street pattern would be developed, or who would bear the costs thereof. It is obvious that if the county pays for all the proposed street area without securing a dedication of the same for that purpose, then the property owner has eaten his cake, and yet still has it to bargain with the city for such advantages as he may secure from that governmental entity.

It is impossible to evaluate what weight the jury may have given to the existence of the city's plan in determining the severance damages. An independent search of the record indicates that the jurors were correctly instructed to consider the effect which the loss of access to Alma Street would have upon the market value of property.[8] Nevertheless, the instruction's reference to the requirement of the dedication and construction of new streets is, on this record, ambiguous. Insofar as the testimony or finding of market value depended upon the outlay necessary to restore the remainder to its previous condition they were factors that could properly have been considered. Insofar as such dedication and improvement were necessary for the community as a whole they were, as has been stated, not properly the subject of compensation in these proceedings.

At condemner's request the jury was charged that if they gave any effect to the adoption of the precise plan they should attribute the same effect to value of the property both before and after the severance.[9] In addition, at the condemner's

---

[8]The instruction, part of one offered by condemnees, reads: ''If the remainder of the property, or to put it another way, the property not taken, is left in a less valuable condition than it was before, then it is your duty to determine to what extent its value has been impaired or lowered. In this regard, you should consider what effect, if any, the loss of access from the defendants' property onto Alma Street will have upon the value of the property, as it is agreed that the property remaining to the defendant owners will be fenced off from Alma Street whereas, prior to the construction, the property fronted on and had access to Alma Street. You may also consider, if you find it to be a fact, any evidence of a requirement that new streets be constructed on the remainder of the defendants' property resulting from the taking of a portion of defendants' property by the County of Santa Clara and the fencing off of defendants' property from Alma Street.

''In this respect, you may consider any damage that will result to defendants' property by virtue of the requirement of new streets being constructed on defendants' remaining property if any, and may consider the effect that the requirement of the dedication and construction if any of new streets will have upon the market value of defendants' property.''

[9]These instructions read: ''If you find that the resolution adopted by the City of Mountain View on October 14, 1963, does have an effect upon the value of defendants' property, you are instructed that you must

request, the jurors were told that the authority to enact zoning and planning laws and ordinances is derived from the police power; that injury to real property resulting from the proper exercise by the government of its police power is not compensable; and that municipal ordinances can have no extraterritorial force.

No testimony was elicited as to the value before the take with the precise plan in existence, because by definition the before condemnation situation precluded the necessity for such streets. In view of the only evidence before the jury, the erronous instruction first referred to in the foregoing paragraph (fn. 9) could not cure the error in permitting the jury to consider that the property embraced within the street lines was lost to condemnees because of the city's adoption of the precise plan.

The case must be reversed on the issue of severance damages.

*The Judgment*

▆▆▆ The county's objections to the form of judgment have no substance. The judgment provides for the county to pay the amount of the award to the clerk of the court, and awards the property to the county in fee simple absolute free of the Gomes estate's security interest. County objects because it provides for payment to the attorneys for the Gindens of a specific fee and for payment of the balance for the reduction of the obligation from Ginden to the Gomes estate. Neither of these payments is a matter of concern to the county of which it may properly complain. The matter of the attorneys' fee is a matter between the condemnees, their vendor, and their attorney. The vendor's estate in fact presented evidence, outside the presence of the jury, establishing its right to a lien on the proceeds.

---

attribute the same effect of this resolution on the value of the property immediately before the taking as you do to the value of the property and the severance damage immediately after the condemnation.

"In other words, if the said resolution has an effect upon the value of the property, it must affect all considerations of the property on the valuation date of January 10, 1964."

"Since the date of valuation is January 10, 1964, you may not speculate as to what the value of defendants' property would be without the passage by the City of Mountain View of its resolution on October 14, 1963; nor may you speculate as to what the value of the property would be with the passage of said ordinance.

"The reason for this is that market value is an effect, and we are not governed by the cause that brings it about in order to determine it. The market value can be neither greater nor less if the case [*sic* ''cause''?] is examined into.''

*Disposition*

In view of the small spread in the testimony concerning the value of the 1.033 acres which were taken, the jury's verdict thereon, and the failure of either party to attack it on appeal, that portion of the judgment which awards $32,850 for the property taken should stand. The judgment is reversed, however, for a retrial on the issue of severance damages[10] with costs of this appeal to be taxed to appellant.[11]

Sullivan, P. J., and Molinari, J., concurred.

A petition for a rehearing was denied November 9, 1966, and respondents' petition for a hearing by the Supreme Court was denied December 14, 1966.

---

[10]As to retrial of particular issue see *Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801-802 [197 P.2d 713]; 3 Witkin, Cal. Procedure (1954) Appeal, § 192, pp. 2391-2392.

[11]*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 68-71 [37 Cal.Rptr. 74, 389 P.2d 539].